IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEBRA L. BERRY,                              §
                                             §
        Plaintiff,                           §
                                             §
V.                                           §        CIVIL ACTION NO. H-05-0092
                                             §
JO ANNE BARNHART,                            §
COMMISSIONER OF THE SOCIAL                   §
SECURITY ADMINISTRATION,                     §
                                             §
        Defendant.                           §

## MEMORANDUM AND RECOMMENDATION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 19), and Plaintiff's cross Motion for Summary Judgment (Document No. 21). After considering the cross motions for summary judgment, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that this matter be REMANDED to the Commissioner of the Social Security Administration for further proceedings.

## I.      Introduction

Plaintiff Debra L. Berry ("Berry") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits.  Berry argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision and that the ALJ improperly rejected part of the opinion of Dr. Sterling Moore, the medical expert who testified at the administrative hearing, regarding her manipulative abilities.  The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, that the ALJ"s decision is consistent with the opinion of the consulting physician who examined Berry, and that the ALJ did not err in rejecting part of the opinion of Dr. Moore.[1]

## II.     Administrative Proceedings

On December 3, 2001, Berry applied for disability insurance benefits, claiming that she has been unable to work since November 1, 2001, as a result of rheumatoid arthritis and cervical and lumbar spinal stenosis.  (Tr. 69-71; 78-88).  The Social Security Administration denied her application at the initial and reconsideration stages.  After that, Berry requested a hearing before an ALJ.  The Social Security Administration granted her request and the ALJ, John Jarrett, held a hearing on January 12, 2004, at which Berry's claims were considered *de novo*.  (Tr. 229-266).  On January 20, 2004, the ALJ issued his decision finding Berry not disabled.  (Tr. 24-30).

Berry sought review of the ALJ's adverse decision with the Appeals Council.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in

---

[1] The Commissioner also argues that the ALJ properly found Berry's depression to not be severe.  Berry has not challenged that finding.

2

reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering Berry's contentions in light of the applicable regulations and evidence, the Appeals Council concluded that there was no basis upon which to grant Berry's request for review. (Tr. 4-6). The ALJ's findings and decision thus became final.

Berry filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g). The parties have filed cross motions for summary judgment (Document Nos. 19 & 21). The appeal is now ripe for ruling.

## III.    Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision  of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C.§ 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v.*

3

*Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993)*.* The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).    The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.    If the claimant is presently working, a finding of "not disabled" must be made;

2.    If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3.    If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.    If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.    If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner shows that other jobs

are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step four that Berry could perform a limited range of sedentary work, that her past relevant work as a receptionist and a secretary fell within that limited range of sedentary work, and that Berry was therefore not disabled. In this appeal, Berry contends that substantial evidence does not support the ALJ's determination that she could perform a limited range of sedentary work, and that the ALJ erred in rejecting the opinion of Dr. Moore, the testifying physician, regarding her gross manipulative abilities.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

The objective medical evidence shows that Berry suffers from rheumatoid arthritis, cervical and lumbar spinal stenosis, and a herniated disc at L5-S1. In addition there is objective medical evidence in the record to support the documented diagnosis of fibromyalgia.

The medical records show that Berry was treated by Dr. Martin Fischer from December 2000 through February 2003, and by Dr. Celeste Thomas from April 2003 through the date of the

administrative hearing.  Dr. Fischer saw Berry on December 28, 2000, at which time she reported having a flare-up of her rheumatoid arthritis with pain and swelling in her left hand that lasted for two days. (Tr. 141).  Upon examination, Dr. Fischer found Berry's wrist to be slightly swollen and tender on the ulnar side.  (Tr. 141).  Dr. Fischer increased Berry's dosage of Celebrex, started her on Plaquenil, and advised her to return for a follow-up visit in a month.  (Tr. 141).

Berry was next seen by Dr. Fischer on April 18, 2001.  (Tr. 141).  At that time, Berry reported that she had had one flare-up in February, 3 to 4 flare-ups in March, and had had pain every day or so in the month of April.  (Tr. 141).  Most of the flare-ups, she reported, lasted a day or two, and usually involved pain and swelling in one area, most recently in her hand and knee.  (Tr. 141).  Swelling was noted in the MCP's (metacarpophalangeals) of her third left finger, but there was no synovitis (inflammation of the synovial membrane).  (Tr. 141).  She was continued on Celebrex and Plaquenil, and Prednisone was added, as needed, to her drug regimen. (Tr. 137).

On April 28, 2001, Berry was again seen by Dr. Fischer.  She complained of pain in her right hand, and a pulling feeling in her forearm when she makes a fist.  (Tr. 137).  A six day course of Prednisone was prescribed and thereafter Berry was to return for follow-up in a month.  At that follow-up visit on May 29, 2001, Berry reported having pain and swelling in both hands, her left knee, and her right shoulder.  (Tr. 137).  Each time she had a flare-up she took Prednisone for three days, but didn't feel like it helped much.  (Tr. 137).

On July 23, 2001, Berry saw Dr. Ruth Spiel for a neurological evaluation of her complaints of back and neck pain.  (Tr. 158-159; 179-180).  Berry related to Dr. Spiel that "she starting having tingling and numbness in her hands" about a year ago.  (Tr. 158).  Berry also reported that she had neck and low back pain, pain and swelling in her hands that goes up to her shoulders, pain, redness

and swelling in her feet, and pain in her knees and right hip. (Tr. 158). A neurological exam revealed that Berry had 5/5 motor strength, intact sensation, normal gait, and normal coordination. (Tr. 158). Dr. Spiel ordered an MRI of both the cervical and lumbar spine, and EMG and nerve conduction tests of the arms and legs. (Tr. 159). The MRI of the lumbar spine revealed degenerative disc disease at L3-4, L4-5, and L5-S1 with disc dehydration, and mild dorsal extradural defects bilaterally at L3-4 and L4-5 secondary to facet and ligamentum flavum hypertrophy, and a .5 cm. left paracentral disc protrusion with posterior annular tear at L5-S1 with probable involvement of the left S1 nerve root in the lateral recess. (Tr. 154-155). The MRI of the cervical spine revealed that degenerative disc disease at C5-6 and C6-7 with anterior and posterior osteophytes, a moderate to severe central stenosis as well as bilateral foraminal stenosis at C5-6, mild central stenosis as well as ventral thecal sac effacement caused by end-plate osteophyte/bulging annulus at C6-7, and bilateral foraminal narrowing caused by facet and uncinate process osteophytes. (Tr. 156-157). The EMG and nerve conduction tests of the upper and lower extremities were, however, normal. (Tr. 149, 150, 153). Upon follow-up with Dr. Spiel on November 13, 2001, Berry was diagnosed with neck and lower back pain due to degenerative discs, a disc herniation in the lower back, and cervical stenosis. (Tr. 145). Dr. Spiel recommended physical therapy and pool therapy. (Tr. 145).

On August 8, 2001, Berry again saw Dr. Fischer. She reported to him that she had lost her job because of time she had missed from work. (Tr. 134). She also reported that she had pain in her left hand, her right elbow and her right shoulder. Swelling and tenderness in the fifth metacarpophalangeal of her left hand were noted by Dr. Fischer. (Tr. 134).

On August 22, 2001, after discussing with Berry the general course of rheumatoid arthritis (RA), and noting that she had symptoms of RA in her hands and left knee, Dr. Fischer administered

a series of steroid injections. (Tr. 133). Thereafter, at Berry's next follow-up visit on October 24, 2001, Berry reported that she was doing much better, and had no joint pain. (Tr. 127). She did complain, however, about some neck pain.  Mobic was prescribed for her as needed. (Tr. 127).

On Berry's next visit, on December 13, 2001, she reported that she was "not too good." (Tr. 127). She related that she had had neck and back pain and had had shoulder pain in mid-November for a period of five days. (Tr. 127). Her left hand had then been swollen on the 20th, and thereafter her left shoulder and right hand were swollen and red. (Tr. 127). She then had right foot pain on the 24th of November for two days, and then another episode of pain in her shoulder and hand. (Tr. 127). Upon physical examination, no symptoms were noted at the time. (Tr. 127). She was prescribed Mobic, Plaquenil, Methotrexate, and Folic acid. (Tr. 123).

On January 17, 2002, Berry reported that was feeling much better with the increased dose of Methotrexate, but that she experienced periods of stiffness, and still had pain daily in her feet and hands. (Tr. 123). Upon physical examination, no symptoms were noted in her upper extremities, but her metacarpophalangeals were slightly tender. (Tr. 123). Over a month later, on February 26, 2006, Berry reported that she hadn't been feeling well at all and that she was having episodes about once a week of pain and swelling in her hands that lasted two to three days. (Tr. 121, 123). Berry also reported that she had been having pain in her shoulders and hips at night, and had been having trouble sleeping. Dr. Fischer prescribed Elavil to help Berry sleep and considered the possibility of adding another medication, Enbrel. (Tr. 121).

On March 20, 2002, Berry underwent a consultative examination with Dr. George M. Isaac. (Tr. 160-164). In a comprehensive written report, Dr. Isaac detailed his objective findings as follows:

. . . . Muscle mass is normal with no isolated atrophy and strength is normal and is 5/5 in all extremities except for hand grips which is weak by 15% in both hands. No isolated weakness of hand muscles supplied by median or radial or ulnar nerve is noted. No atrophy of thenar or hypothenar or interossei muscles is noted. No sensory deficits are noted. Coordination is normal. DTR's [deep tendon reflexes] are normal and physiological in both sides. Babinski is flexor and Romberg sign is normal and gait is normal.

Extremities and spine: She has moderate pain and tenderness in MCP and PIP joints of all fingers and anterior and posterior aspects of wrists and anterior aspect of right shoulder. No effusion or redness or warmth or instability is noted in any joint. Range of motion of joints of fingers and wrists and elbows is normal and full. Flexion and extension of knees are full and are associated with mild crepitus in both sides.

Abduction of right shoulder is limited to 90 degrees and extension to 10 degrees and flexion to 70 degrees and they are full in left shoulder.

She is able to pick up a small object like a pencil with fingers of either hand and button clothes. Hand grip and pinch and grasp are weak by 10-15% in both sides equally due to pain in hands. No redness of skin or elevation of temperature or puffiness or swelling or instability or subluxation is noted in any joints.

She is able to bend and touch the finger to the floor. Flexion and extension and lateral flexion are normal. Rotations are normal. She is able to walk on her heels and toes for [a] few steps. She is able to do the tandem walking and is unable to hop. She is able to squat almost fully and get up with some help and assistance. She is able to stand on either leg alone unsupported.

Dorsal pedis and posterior tibial pulsations are well palpable and no pedal edema is noted. No cyanosis or clubbing of the fingers is noted.

Examination of the spine shows moderate pain and tenderness from C5 to T1. No spasm of the paraspinal muscles of the lumbar spine is noted. Straight leg raising test show that she is able to raise either leg to 90 degree actively and 100 degrees passively. She is able to do heel to shin tests. Range of motion of the cervical spine is normal and full.

(Tr. 162). Based upon his objective findings, Dr. Isaac confirmed the diagnoses in Berry's medical records of rheumatoid arthritis and spinal stenosis. (Tr. 163).

On April 9, 2002, at her next visit with Dr. Fischer, Berry claimed to be doing better, and stated that she had had fewer episodes of swelling, but continued to have stiffness in the mornings. Upon examination synovits was noted in the right third PIP (posterior interphalangeal).  (Tr. 121). Enbrel was ordered.  (Tr. 121).  By June 5, 2002, Berry was experiencing the same symptoms, and there was no change in her diagnosis.  (Tr. 120).

On August 23, 2002, Dr. Fischer sent Berry for another consultative orthopedic evaluation. (Tr. 185).  At that examination, Berry rated her neck and back pain as a "1" ("annoying") on a scale from -0- ("none") to 5 ("agonizing").  (Tr. 185).  She reported that her back pain is worse on the right than the left, that the pain radiated into both legs and both knees, and that it is worse with any type of movement.  (Tr. 185).  Upon examination, no significant back pain was noted.  (Tr. 185).  In addition, no swelling was noted in Berry's hand joints or knees.  (Tr. 185).  Berry was continued on anti-inflammatory medication and instructed to call for pain medication as needed.  (Tr. 185).

On September 9, 2002, at her next follow-up visit with Dr. Fischer, Berry complained of pain and swelling in her hands and feet, and five to six hours of stiffness a day.  Symptoms were noted in Berry's right wrist, and in right third PIP (posterior interphalangeal).  She also had tenderness and swelling of her metacarpophalangeals.  (Tr. 190).  Thereafter, on November 13, 2002, Berry complained of chronic pain in her right wrist and hand.  (Tr. 184).  Synovitis was noted in her right wrist, metacarpophalangeals and the right third PIP, and trace effusion was seen in her left knee.  (Tr. 184).  Enbrel injections were given for the first time on December 13, 2002.  (Tr. 183).  By February 27, 2003, Berry reported that she had begun to feel better, but there was still swelling in her second and third PIP, and her metacarpophalangeals were still tender.  (Tr. 182).

In April 2003, Berry began to see a different rheumatologist, Dr. Celeste Thomas.  (Tr. 206).

At her first visit on April 30, 2003, Berry complained of pain in her feet across her toes and ankles, swelling in both feet, but more so on the left, and soreness in her feet in the mornings.  (Tr. 206). Berry also complained about swelling in her fingers and hands.  (Tr. 206).  Upon examination, Dr. Thomas found tenderness in Berry's elbows, shoulders, and feet.  She also found swelling in Berry's left fifth finger, tenderness and effusion in her right hip, and a bunion on Berry's left foot.  (Tr. 205). She also noted that Berry tested positive at all the fibromyalgia tender points.  Dr. Thomas referred Berry to a podiatrist for orthotics.  (Tr. 205).  At her next visit with Dr. Thomas on June 26, 2006, no synovitis was apparent, but there was stiffness in Berry's joints.  (Tr. 204).  On September 18, 2003, at her next follow-up visit, Berry reported that her feet were hurting, her hands were swollen, her shoulders and neck hurt, and she was having trouble sleeping.  (Tr. 203).  In addition, Berry's blood pressure was significantly elevated.  (Tr. 203).  All "T points" were positive and tenderness was noted in the fingers and toes of Berry's hands and feet.  (Tr. 203).  Berry was re-started on Prednisone.  (Tr. 203).  This is the final progress note included in the administrative record.

Having reviewed the objective medical evidence in the record, it is clear that Berry has rheumatoid arthritis, cervical and spinal stenosis, and a herniated disc at L5-S1.  There is also objective medical evidence to support Dr. Thomas' suggestion that Berry also suffers from fibromyalgia.[2]  However, none of the objective medical evidence, standing alone, establishes that Berry's is disabled, or presumptively disabled under any applicable listing.  Therefore, the objective medical evidence factor supports the ALJ's decision.

---

[2] "The fibromyalgia syndromes (myofascial pain syndromes, fibromyositis) are a group of disorders characterized by achy pain and stiffness in soft tissues, including muscles, tendons (which attach muscles to bones), and ligaments (which attach bones to each other)."  MERCK MANUAL (Home Ed. 1997) at 250.

B.        **Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

There are three expert medical opinions in the record: (1) a residual functional capacity assessment completed by Frederick Cremona on April 9, 2002, from his review of Barry's medical records (Tr. 165-172); (2) a written report and opinion by Dr. Isaac, who conducted a consultative examination of Berry on March 20, 2002 (Tr. 160-164); and (3) the opinion offered by the testifying medical expert, Dr. Sterling Moore, at the hearing held on January 12, 2004.  (Tr. 254-259, 264). Dr. Cremona, in the written Residual Functional Capacity Assessment he completed in April 2002,

opined, from his review of Berry's medical records through that date, that Berry could occasionally

lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours

in an 8-hour day, sit for about 6 hours in an 8-hour day, and had no manipulative, communicative,

or environmental limitations. (Tr. 165-169). Dr. Cremona based his opinion on the fact that Berry

reported, on January 17, 2002, that she was feeling better, the lack of atrophy or sensory deficits, and

the type of medications she was taking to alleviate her symptoms. (Tr. 171-172).  Dr. Isaac, in his

written report dated March 20, 20025, found that Berry could sit, stand, walk and ambulate without

an assistive device, could lift and carry objects weighing 10-15 pounds for about 40 feet, had normal

gait and station, had no sensory or reflex abnormalities, had a moderate ability to reach and feel and

grasp, had no difficulty associating with other people, had normal mannerisms and behavior, and had

no mental status deficits.  Dr. Moore, in his testimony at the hearing held on January 14, 2004,

opined that Berry had rheumatoid arthritis, fibromyalgia, and degenerative changes in her neck and

lower back, but that those impairments did not equal or meet an applicable listing.  (Tr. 254-255).

Dr. Moore then opined, based on the medical records he reviewed, that Berry had "the capacity for

lifting and carrying 10 pounds maximum and less than 10 pounds more frequently," sitting for up

to six hours, standing and walking from two to four hours, but would need to be able to change

positions every 30 to 60 minutes.  (Tr. 257).  Dr. Moore also opined that Berry could only engage

in gross and fine manipulative occasionally.  He based that opinion on Berry's manipulative abilities

on 'the evaluations by her rheumatologists recently to reduce her down to less than a frequent level."

(Tr. 257).

        The ALJ, in his written decision, found that Berry had rheumatoid arthritis and degenerative

disc disease, and that those impairments were severe.  The ALJ also found that none of Berry's

impairments, either singly or in combination, met or equaled a listing.  Then, the ALJ determined

that Berry had the "residual functional capacity to perform at less than the full range of sedentary,

but not significantly less", and that Berry could "do occasional fine manipulation with her hands."

(Tr. 29).  It is the ALJ's determination that only Berry's fine manipulative ability was compromised

that is the main focus of this appeal.  Berry argues that the ALJ erred in his determination that her

gross manipulative ability was not compromised, and erred when he rejected the opinion of Dr.

Moore as to her gross manipulative ability.  The Commissioner, in contrast, argues that the ALJ's

determination that only Berry's fine manipulative ability was compromised is supported by the

objective medical evidence and the findings and opinion of Dr. Isaac.

   The ALJ did not mention or address Dr. Moore's opinion that Berry could only occasionally

engage in both fine *and* gross manipulation with her hands.  Instead, the ALJ misstated Dr. Moore's

opinion as being that Berry's "fine manipulation would be reduced to occasional."  (Tr. 29).  This

characterization of Dr. Moore's testimony is inconsistent with the record.  Dr. Moore clearly testified

that it was his opinion, based on Berry's more recent medical records, that her ability to engage in

fine and gross manipulation would be reduced to occasional.  That testimony was reiterated by Dr.

Moore upon questioning by Berry's attorney:

> Q:   Okay, Dr. Moore, when you were describing limitations with her hands, I
>      must have misheard you.  I thought you'd say that you thought it would be
>      less than frequent limitations on the hands.
>
> A:   I said gross and fine would be occasional –

(Tr. 264).  Here, where the ALJ mischaracterized and misstated the opinion of Dr. Moore, and then

relied on that mischaracterization to support his conclusion that Berry was only limited in her ability

to engage in fine manipulation, the ALJ erred.  *See Winkowitsch-Smith v. Barnhart*, 113 Fed. Appx.

15

765, 767 (9th Cir. 2004) ("An ALJ cannot substitute his own opinion for that of the medical experts

by disregarding evidence in the record."); *Watson v. Bowen*, 880 F.2d 417 (9th Cir. 1989) (Table)

("An ALJ may disregard uncontroverted medical expert testimony if he sets forth 'clear and

convincing specific reasons for doing so.'"); *see also, e.g., Mahoney v. Apfel*, 48 F.Supp.2d 237,

244-245 (E.D. N.Y. 1999) (concluding, in case in which the ALJ misconstrued and mischaracterized

the testimony of the testifying medical expert, that the "ALJ was not entitled to substitute his own

opinion" for that of a medical expert).  While the Commissioner argues that the ALJ's findings as

to Berry's manipulative abilities is, in any event, supported by substantial evidence in the form of

the opinions of Dr. Cremona and Dr. Isaac, neither opinion can cure the ALJ's error.  Dr. Cremona

and Dr. Isaac issued their opinions regarding Berry's residual functional capacity in early 2002,

almost two years before the opinion of Dr. Moore.  In addition, Dr. Moore's opinion and testimony

about Berry's manipulative abilities was based on Berry's more recent medical records, records that

neither Cremona nor Isaac saw.   Finally, the record shows that Dr. Moore specializes in

rheumatology (Tr. 51), whereas there is no indication in the record if either Cremona or Isaac is a

specialist.  Because the ALJ erred in mischaracterizing and/or rejecting, without explanation, that

part of Dr. Moore's opinion that Berry was limited to only occasional gross manipulation with her

hands, and because Berry's ability to engage in gross  manipulation with her hands on an unlimited

basis has significant bearing on her ability to perform her past relevant work, *see infra* at 18-20, the

diagnosis and expert medical opinion factor does not support the ALJ's decision.

### C.     Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the

claimant's testimony and corroboration by family and friends.  Not all pain and subjective symptoms

16

are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.   In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant.  *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Berry testified at the hearing that she experiences a lot of pain in her neck, back and her feet.(Tr. 236).  She also testified that her hands frequently tingle and are numb, that her knees bother her, that she can't stand straight, that her back hurts 99% of the time, and that her shoulders and muscles hurt.  (Tr. 236).  When asked about her last job, Berry stated that she lost her job when she began having more frequent problems with her hands and feet, with flare-ups of pain and swelling.  (Tr. 243-244).  Berry described the pain in her hands and feet as like pins and needles, stated that she has swelling in both her hands and feet, and that her hands are typically swollen in the mornings, and that she has to occasionally use a cane to ambulate.  (Tr. 245).  Berry also stated  that she cannot open a coke can or a jar, cannot tie her shoes some days, cannot lift a gallon of milk, and spends most of her day in a recliner.  She does light housework, and babysits her young grandchildren, but does not do the cooking or grocery shopping, and cannot drive far.  (Tr. 249-252).

The ALJ found Berry's complaints generally credible, but determined that Berry could "make a vocational adjustment to perform other work."  (Tr. 29).  That credibility determination, particularly in light of Berry's complaints about the pain and swelling in her hands, is not wholly consistent with the ALJ's determination that Berry's gross manipulative abilities are not compromised by her impairments.  Thus, this factor also does not support the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

As of the date of the administrative hearing, Berry was 46 years old, had a twelfth grade education, and had past work experience as a secretary, a manager of various tool rental companies, a sales coordinator, a route sales person, and a receptionist.  (Tr. 261-262). Based on his determination of her residual functional capacity, the ALJ posed a hypothetical to a vocational expert ("VE") about Berry's ability to engage in her past work:

> ALJ:  Okay, please assume the Claimant can work at the sedentary level, that she's able to lift and carry up to 10 pounds, from 0 to 10 pounds.  Please assume that she could sit, stand, and walk for six hours out of [an] eight-hour day.  Please assume that she is to avoid climbing, balancing, stooping, kneeling, crawling.  Please assume that she has gross dexterity in, for her hands.  She's capable of fine dexterity of six hour[s] out of a[n] eight-hour day, but she has some pain,  But it's not –
>
> VE:  Six of eight?
>
> ALJ:  Yes.
>
> VE:  Is that what you said?
>
> ALJ:  Right, she may have pain time to time.  There are no communication deficits.  She – hearing, talking, no visual limitations.  No limitations with, to the environment.  I don't want her to be in extreme cold weather because of the rheumatoid arthritis, but in a sedentary office setting, she should have no problems.  Doctor, would repetitive in a work have any bearing on her ability to use her hands? And I'm saying repetitive.  I don't know.  Ma'am, did you ever engage in any repetitive type work.  You're shaking your head.  What does that mean?

Claimant:  As in I don't understand.

ALJ:   Were you working punching buttons, punching holes or something continuously all day?

Claimant:  No.

ALJ:  Okay, strike that.  Okay, that's all the limitations.  Can she return to any of her prior work?

VE:  Your Honor, this would place an individual at a sedentary, as you stated, occupation.  Whereas you stated in there no stooping; however, that doesn't apply to sedentary occupations, Your Honor.  There's really not any significant stooping required.

ALJ:  Okay.

VE:  If there had been, that then would eliminate that occupation.

ALJ:  Okay.

VE:  However, stated it doesn't apply to sedentary occupations.  Therefore, yes, Your Honor, she could do the sedentary occupations as previously described.

ALJ:  She could return to the –

VE:  Receptionist job.

ALJ:  And the secretary?

VE:  And the secretary, Your Honor –

ALJ:  Okay.

VE:  – with the limitations as identified.

(Tr. 262-264).  Berry's attorney then clarified Dr. Moore's opinion regarding Berry's ability to use her hands, and thereafter asked the vocational expert whether Berry could return to her past work as a receptionist or secretary if her gross manipulative abilities were diminished, as opined by Dr. Moore:

ALJ:  Okay, Counselor, pose any hypotheticals or make any statements?

Attorney:  Okay, Dr. Moore, when you were describing limitations with her hands, I must have misheard you.  I thought you'd say that you thought it would be less than frequent limitations on the hands.

Dr. Moore:  I said gross and fine would be occasional[3] –

Attorney:  Okay.

Dr. Moore:  – in my opinion.

Attorney:  Also, given the condition of the stenosis, the fibromyalgia and the arthritis in combination of those underlying conditions and the medications, do you think the pain would be severe enough that it would cause lapses of concentration in the work?

Dr. Moore:  I[t] could.  I don't know that it would, but it could.

Attorney:  Okay, Mr. Riley [VE], assume an individual who has to change positions at least every 30 to 60 minutes, lifting no more than 5 to 10 pounds and use of the hands for fine and gross movements is limited to no more than a third of the day.  And has – would have occasional lapses of concentration, persistence and [pace] due to the pain.  How would that impact her – how would that hypothetical individual be able to perform any of the past jobs you identified or the other jobs?

VE:  They would not be able to, Mr. Driscoll, because when you limit an individual to gross and fine finger manipulation to up to a third of the day, it requires – sedentary occupations require more frequent than a third of the day.

(Tr, 265-265).

Given the ALJ's failure to acknowledge Dr. Moore's opinion regarding Berry's ability to perform gross manipulations with her hands, a failure which effects the ALJ's determination that Berry can engage in her past relevant work as a secretary or receptionist, the education, work history and age factor also does not support the ALJ's decision.

------

[3] "Occasional" is defined in Social Security Ruling 83-10 "as occurring from very little up to one-third of the time".

## VI.    Conclusion and Recommendation

Based on the foregoing and the conclusion that the ALJ erred in failing to consider the testifying medical expert's opinion as to Berry's ability to perform gross manipulation with her hands, the Magistrate Judge

RECOMMENDS that Plaintiff's Motion for Summary Judgment  (Document No. 21) be GRANTED, that Defendant's Motion for Summary Judgment (Document No. 19) be DENIED, and that this matter be REMANDED to the Commissioner of the Social Security Administration for further proceedings, including, in appropriate, an evaluation of Berry's gross manipulative abilities.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77028.

Signed at Houston, Texas, this  6th day of  October,  2006.

Frances H. Stacy
United States Magistrate Judge